IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ALPHONSO ELEBY,                        :
                                       :
        Plaintiff,                     :
                                       :           CIVIL ACTION NO.
                                       :           1:14-CV-02092-LMM
v.                                     :
                                       :
LEE MAY, in his official capacity as   :
Interim Chief Executive Officer of     :
DEKALB COUNTY, GA, DEMETRIUS           :
KENDRICK, PATRICK MITCHELL,            :
MICHAEL SLAY, SHANNON                  :
STOLARSKI, JOSEPH KING, and            :
EDWARD BATES,                          :
                                       :
        Defendants.                    :

## ORDER

This case comes before the Court on Defendants' Motions for Summary

Judgment [125, 128]. After due consideration and a hearing held on August 2,

2016, the Court enters the following Order:

## I.    BACKGROUND[1]

At approximately 8:53 p.m.[2] on July 6, 2012, Keione Harris arrived at a

Chevron station in DeKalb County, Georgia, in his pickup truck. Dkt. No. [149] ¶

---

[1] All facts are construed in a light most favorable to Plaintiffs as the non-moving parties.

[2] A time-stamped video of these events was recorded at the convenience store where the incident that concerns these claims occurred. Dkt. No. [126].

1. At approximately 8:58 p.m., Plaintiff, wearing loose fitting cargo pants, walked out of the Chevron store to the driver's side door, and began speaking with Harris. Id. ¶¶ 2-4; Dkt. No. [138] ¶ 26 (admitting to Plaintiff wearing loose cargo pants). Plaintiff then got into the front passenger seat next to Harris. Dkt. No. [138] ¶ 10. At approximately 8:58 p.m., Sapphire Rodriguez, who arrived at the Chevron station with Harris, came out of the Chevron store and got into the right backseat of Harris' vehicle. Dkt. No. [149] ¶ 5.

At approximately 9:00 p.m., Defendant Kendrick, a DeKalb County police officer, pulled into the Chevron Station in his DeKalb County Police vehicle near Harris' vehicle. Id. ¶ 6. At that point, Kendrick claims to have smelled marijuana coming from Harris' car.[3] Dkt. No. [138] ¶ 7. Kendrick then walked up to Harris' driver door window and told Harris to put the car in park. Id. ¶ 8; Dkt. No. [149] ¶ 7. At the time of this encounter, Kendrick was working for the DeKalb County Police "NET" team that focuses on high crime areas. Dkt. No. [149] ¶ 8.

Kendrick asked Harris, Plaintiff, and Rodriguez for their identification and asked if there were any illegal drugs or weapons located inside the vehicle, which the occupants denied. Dkt. No. [138] ¶ 12. When Kendrick asked if he could search the vehicle, Harris refused to give consent. Id. ¶ 14.

---

[3] In his response to Defendants' statement of facts, Plaintiff says he doubts Kendrick could have smelled marijuana, says he cannot admit or deny that Kendrick smelled marijuana, but admits that Kendrick testified that he smelled marijuana. Dkt. No. [138] ¶ 7.

At approximately 9:02 p.m., Kendrick called into dispatch to report a self-initiated encounter of Harris' vehicle. Dkt. No. [149] ¶ 9. Subsequently, Defendant Slay arrived at the scene. Dkt. No. [138] ¶ 15. Slay is also a DeKalb County police officer.

Slay walked to the vehicle's passenger side and saw Rodriguez in the rear seat. Id. ¶ 17. At that point, Slay claims to have smelled marijuana coming from Harris' vehicle.[4] Id. ¶ 18.

At approximately 9:09 p.m., Defendant King arrived on the scene. Dkt. No. [149] ¶ 10. Defendant Stolarski arrived shortly after. Dkt. No. [138] ¶ 20. King and Stolarski are also DeKalb County police officers.

King and Stolarski went to the rear passenger side and spoke with Rodriguez. Id. ¶¶ 21-22. At that point, Rodriguez admitted to having marijuana in her purse and voluntarily gave the drugs to King. Id. ¶ 23.

At approximately 9:22 p.m., the occupants exited the vehicle at the officers' request. Id. ¶ 25; Dkt. No. [149] ¶ 12. As Plaintiff was exiting the vehicle, King asked Plaintiff if he had any weapons. Dkt. No. [138] ¶ 25. King then conducted a search of Plaintiff's person; however, the parties dispute what the search entailed.[5] Id. ¶ 27. Plaintiff alleges that King, "searched my pockets . . . reached in

---

[4] In his response to Defendants' statement of facts, Plaintiff says he cannot admit or deny that Slay smelled marijuana, but admits that Slay testified that he smelled marijuana. Id. ¶ 18.

[5] Plaintiff testified in his deposition that King, "searched my pockets . . . reached in my pockets and pulled them out . . . unfastened my belt . . . felt under my feet, [and] felt my inner thigh area." Dkt. No. [127-8] at 74-76. King testified in his

my pockets and pulled them out . . . unfastened my belt . . . felt under my feet, [and] felt my inner thigh area." Dkt. No. [127-8] at 74-76. King testified in his deposition that he "did a pat-down of [Plaintiff's] outer pants." Dkt. No. [127-1] at 31.

A look at the video evidence is inconclusive as Plaintiff and King were behind Harris' truck, out of view of the convenience store camera. CD at 21:22, Dkt. No. [126]. Nonetheless, after the search, Plaintiff can be seen walking around the truck toward Kendrick where he lifts his hands a reveals that his pants are below his buttocks, id. at 21:23:07; whether this is because King undid Plaintiff's belt or because Plaintiff's pants were already loose, as Defendants argue, is not apparent from the tape.[6]

After the search, Plaintiff walked over to the curb where Harris was already seated. See id. at 21:23. Before sitting down, Defendant Kendrick performed a second search of Plaintiff's person; however, the parties also dispute the nature of this search. Kendrick contends that he simply patted Plaintiff down and "went around his waist band." Dkt. No. [137] ¶ 67. Plaintiff, however, contends that Kendrick "took his hands and . . . felt my buttocks area and under the back part of

---

deposition that he "did a pat-down of [Plaintiff's] outer pants." Dkt. No. [127-1] at 31.

[6] Additionally, when Plaintiff walks over to Kendrick for the second search and raises his hands above his head, there is a split second where it appears Plaintiff's belt is, in fact, undone. However, based on the quality of the video, the Court cannot say one way or the other that Plaintiff's belt was undone.

my crotch area, and then he went to the front and searched inside my pants to make sure I wasn't hiding anything in my crotch area on the inside." Id. ¶ 66.

The video shows Kendrick holding up Plaintiff's pants from behind, bending down and beginning to feel between Plaintiff's legs. CD at 21:23:27, Dkt. No. [126]. However, it is unclear from the tape whether Kendrick's hands are under Plaintiff's shorts or merely touching the outer layer of his clothing.

Next, the video shows Kendrick standing up and reaching around Plaintiff with his left hand towards his front while still grasping Plaintiff's pants in the back with his right hand. Id. at 21:23:29. Again, the video does not show that Kendrick has gone under Plaintiff's outer layer of clothing. After the search, Plaintiff sat on the curb next to Harris. Dkt. No. [138] ¶ 39.

Eventually, Defendant Bates arrived with the canine unit. Id. ¶ 30. The police dog performed an open-air sniff and alerted to detecting illegal substances inside Harris' vehicle. Id. ¶ 32. The police dog went into the vehicle and alerted to detecting a substance in a plastic container located in the vehicle. Id. ¶ 33. The plastic container stored marijuana. Id. ¶ 36. Harris admitted to owning the marijuana inside the plastic container. Id. Harris was then placed in handcuffs at approximately 9:25 p.m. Id. ¶ 37. Rodriguez was also placed under arrest for the marijuana in her purse. Id. ¶ 38.

While the Officers were placing Harris and Rodriguez under arrest, Plaintiff was still sitting on the curb. Id. ¶ 39. Defendant Stolarski directed him to stop making movements with his legs and hands. Id. ¶ 41.

At approximately 9:36 p.m., Kendrick walked over to Plaintiff and looked through the contents of Plaintiff's pocket which were removed during the initial search. Id. ¶ 42. Kendrick then walked back to Harris' vehicle and searched the driver side door. See C.D. at 21:36, Dkt. No. [126]. Stolarski then walked over to help search the vehicle while Slay and King completed paperwork. Dkt. No. [138] ¶¶ 43-44.

At this point, Kendrick walked back to Plaintiff on the curb. See C.D. at 21:37, Dkt. No. [126]. It was at this time Kendrick claims to have found marijuana on the ground behind Plaintiff. Plaintiff claims Kendrick actually planted the marijuana behind Plaintiff. Dkt. No. [137] ¶ 68. Plaintiff denied that the marijuana was his, and none of the other officers claim they saw Plaintiff discard the substance on the ground. Dkt. No. [149] ¶¶ 44, 49. No one saw the marijuana prior to this time.

After picking up the marijuana from behind Plaintiff, Kendrick arrested Plaintiff. Dkt. No. [137] ¶ 79. The video footage shows Kendrick standing behind Plaintiff. See C.D. at 21:37, Dkt. No. [126]. The footage shows Kendrick lifting Plaintiff to his feet from the curb while Defendant Stolarski appears to assist. Id. As soon as Plaintiff is on his feet, Kendrick places his right arm around Plaintiff's neck, tilting him backwards. Id. at 21:37. With his arm still around Plaintiff's neck, he manages to get Plaintiff to his knees. Id. at 21:37. Plaintiff then sinks to the ground and is surrounded by Kendrick, Stolarski, and one other Officer. Id. Plaintiff is then lifted to his knees by Kendrick and Stolarski. Id. at 21:37.

Kendrick then handcuffs Plaintiff while Stolarski keeps a hold of Plaintiff's left arm. Id. Plaintiff then gets to his feet without physical prompting or help. Id. at 21:38. However, as soon as he stands, Stolarski and another Officer push him to his knees once more. Id. 21:38. A few moments later, Stolarski and the other Officer lift Plaintiff back up and walk him off screen. Id. 21:38.

After being arrested for marijuana possession, Plaintiff's case was set for trial. Eleby Depo., Dkt. No. [125-14] 114:20. However, the charges were ultimately dismissed Id. at 114:23. Thereafter, Plaintiff's criminal defense attorney filed a complaint with the DeKalb County Police Department against Kendrick for allegedly planting evidence. Id. at 126:7-11.

After an internal investigation, Kendrick was charged by the DeKalb District Attorney's Office for violating his oath of office "by unlawfully arresting Alphonzo Eleby for possession of marijuana, knowing that Eleby did not possess said marijuana." Dkt. No. [137] ¶ 97. However, Kendrick was ultimately acquitted. Id. ¶ 99.

During Kendrick's investigation and subsequent trial, Plaintiff's criminal defense attorney sent a tape of the incident, taken from the Chevron security camera, to the investigators. Kendrick Depo., Dkt. No. [125-13] 25:4-10. The tape, as given to the investigators, appeared to show Kendrick taking an action which could have been interpreted as planting evidence. See Investigation Report, Dkt. No. [125-16] at 50.

Kendrick received a copy of the tape from his attorney. Mitchell Memo, Dkt. No. [125-16] at 43. He then gave a copy of that tape to Defendant Mitchell, saying it came from the Solicitor General's Office, to determine if it had been altered. Mitchell Depo., Dkt. No. [125-16] 30:3. Defendant Mitchell worked as a computer forensic examiner for DeKalb County Police Department. Id. at 8:21.

Mitchell conducted an analysis of the tape before talking to his supervisor. Mitchell determined that the tape had, in fact, been manipulated.[7] Mitchell Memo, Dkt. No. [125-16] at 43. He then wrote a report detailing the exact movements of each person in the video and sent it to internal affairs. Id. at 46. However, he did not include any discussion of Kendrick allegedly throwing something behind Plaintiff and then picking it back up. Investigation Report, Dkt. No. [125-6] at 50.

According to an investigation done after Mitchell completed his report, Mitchell had not included any description of Kendrick allegedly throwing something behind Plaintiff because the video he received from Kendrick did not include that segment. Id. However, once Mitchell was shown the entire, unaltered video by the DeKalb County District Attorney's Office, he changed his report to include a description of Kendrick's alleged throwing motion. Id.

Plaintiff now brings this action against Defendant Kendrick, Defendant Mitchell, Defendant Slay, Defendant Stolarski, Defendant King, and Defendant Bates in their individual capacities. Dkt. No. [1-1]. Additionally, Plaintiff has

---

[7] The tape submitted to the Court appears to be the unaltered video.

brought this action against Defendant Lee May, in his official capacity as Interim Chief Executive Officer of DeKalb County, Georgia. Id.

In his Complaint, Plaintiff brings eight causes of action against Defendants: (1) unreasonable search and seizure in violation of the Fourth Amendment of the United States Constitution against all Defendants; (2) false imprisonment under Georgia law against Kendrick; (3) false arrest under Georgia law against Kendrick; (4) assault under Georgia law against Kendrick; (5) battery under Georgia law against Kendrick and King; (6) malicious prosecution under Georgia law against Kendrick and Mitchell; (7) bad faith fees and expenses under Georgia law against King, Kendrick, and Mitchell; and (8) punitive damages against King, Kendrick, and Mitchell.[8]

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the

---

[8] Plaintiff clarified the claims he was bringing against each Defendant at the hearing.

applicable substantive law which might affect the outcome of the case." <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." <u>Celotex Corp.</u>, 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. <u>Johnson v. Clifton</u>, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. <u>Id.</u> (citations omitted). All reasonable doubts, however, are resolved in the favor of the non-movant. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993).

## III.   DISCUSSION

As mentioned above, Plaintiff brings eight causes of action against Defendants. The Court will analyze the federal claims and then the state law claims.

### A. Federal Law Claims

Plaintiff has brought one count of unreasonable search and seizure in violation of the Fourth Amendment of the U.S. Constitution against all Defendants.[9] Plaintiff brings the claim under multiple theories.

First, Plaintiff claims that, while the initial stop by Kendrick in the Chevron parking lot was constitutional, King's search of Plaintiff was unconstitutional. Dkt. No. [135] at 5. Second, Plaintiff contends that the second search, conducted by Kendrick, was unconstitutional. Third, Plaintiff claims that detaining Plaintiff during the search of Harris' vehicle was unconstitutional. Fourth, Plaintiff argues that Kendrick's use of force when executing Plaintiff's arrest was unconstitutional. And lastly, Plaintiff claims that the arrest itself was unconstitutional.

The individual Defendants assert qualified immunity for Plaintiff's federal claims. Defendant DeKalb County claims it deserves summary judgment because

---

[9] Initially, there was some confusion as to whether Plaintiff sought to bring a federal law claim for violation of his Fourteenth Amendment right. However, during the oral argument held on August 2, 2016, Plaintiff confirmed that he brings no Fourteenth Amendment claims under the United States Constitution.

Plaintiff has failed to show municipal liability.[10] The Court will first analyze the claims as against the individual Defendants and then the claims as against DeKalb County.

### i. Individual Defendants

The individual Defendants claim qualified immunity for Plaintiff's federal law claims. The qualified immunity analysis is a two-pronged approach. <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009). Courts must determine (1) if there was a constitutional violation, and (2) whether that violation was clearly established.[11] <u>Id</u>.

### 1. Plaintiff's initial search

The Court must determine if Plaintiff's initial search by King was a constitutional violation, and if it was, whether it was clearly established.

---

[10] While Plaintiff has sued Lee May in his official capacity as Interim CEO of DeKalb County, such claims are equivalent to claims against DeKalb County itself. <u>Gosner v. Twiggs Cty.</u>, 182 F. Supp. 2d 1253, 1256 (M.D. Ga. 2002) (citing <u>Owens v. Fulton Cty.</u>, 877 F.2d 947, 951 n.5 (11th Cir. 1989)) ("[F]or liability purposes, a suit against a public official in his official capacity is considered a suit against the local government he represents."). As such, the Court will refer to DeKalb County as the defendant rather than Lee May.

[11] In Defendant Kendrick's Motion for Summary Judgment, he argues that he is entitled to both qualified immunity and absolute immunity. Kendrick's absolute immunity defense is raised in relation to his grand jury testimony. Yet, Kendrick fails to explain how absolute immunity, given to witnesses at grand jury hearings, relates to the facts of this case. Instead, Kendrick merely states that he testified at a grand jury hearing and is therefore absolutely immune from Plaintiff's claims. Because Kendrick does not explain why his testimony at a grand jury hearing has anything to do with his liability in this case, the Court dismisses the argument without further analysis.

Additionally, because Plaintiff blames each Officer, the Court must determine which Officers may be held liable.

### a. Is Defendant King Liable?

Before discussing the other Officers, the Court will discuss whether Defendant King's initial search violated Plaintiff's constitutional rights and whether those rights were clearly established.

Plaintiff contends that King's initial search was unconstitutional in the manner in which King executed the search. Specifically, Plaintiff contends that King performed an unlawful strip search.

Importantly, during oral argument, Plaintiff's counsel agreed that performing a limited pat down of Plaintiff when he first stepped out of the truck was constitutional. Indeed, in Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court held that a "stop and frisk" may be conducted "without violating the Fourth Amendment's ban on unreasonable searches and seizures if two conditions are met." Arizona v. Johnson, 555 U.S. 323, 323 (2009) (citing Terry, 392 U.S. at 1). "First, the investigatory stop . . . must be lawful." Id. These stops have become known as Terry stops. "Second, to proceed from a stop to a frisk (patdown for weapons), the officer must reasonably suspect that the person stopped is armed and dangerous." Id. These searches have become known as Terry frisks.

The Supreme Court has held that traffic stops conducted under the Terry framework are "especially fraught with danger to police officers." Id. at 324 (quoting Michigan v. Long, 463 U.S. 1032, 1047 (1983)). Specifically, the Court

has held that drivers and passengers might have an incentive "to use violence during a stop" to prevent officers from discovering a greater crime than the violation for which they are already stopped. Id. (citing Maryland v. Wilson, 519 U.S. 408, 414 (1997)).

Because of the potential for those situations, police officers may order the occupants to get out of the vehicle without violating the Fourth Amendment because the government's "'legitimate and weighty' interest in officer safety outweighs the '*de minimis*' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle." Id. (citing Pennsylvania v. Mimms, 434 U.S. 106, 110-11 (1977)). Additionally, once the occupants are outside the vehicle, an officer is permitted to perform a *Terry* frisk to ensure his or her safety "if the officer reasonably concludes that the [occupants] might be armed and dangerous." Id. (citing Mimms, 434 U.S. at 112); Wilson, 519 U.S. at 414 (applying this concept to any occupants of the vehicle, not just the driver).

The question for the Court is not whether a *Terry* frisk would have been appropriate given the circumstances. Instead, the Court must determine whether the manner in which King performed the *Terry* frisk was unlawful. Plaintiff contends that the frisk went beyond a mere *Terry* frisk and became an illegal strip search when King allegedly undid Plaintiff's belt.

As support for his contention that King's actions amount to a strip search, Plaintiff cites Doe v. Calument City, Ill., 754 F. Supp. 1211, 1215 n.9 (N.D. Ill. 1990). In that case, the Northern District of Illinois concluded that a strip search

includes "any exposure or observation of a portion of a person's body where that person has a 'reasonable expectation of privacy.'" Calument City, 754 F. Supp. at 1215 n.9 (quoting Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J. concurring)). According to Plaintiff, when King allegedly undid Plaintiff's belt and his pants became loose, King was exposing a part of Plaintiff's body in which he had a reasonable and subjective expectation of privacy.[12]

Defendants contend that the pat down was not a strip search because King merely patted the outside of Plaintiff's clothing. He denies having undone Plaintiff's belt or instructing Plaintiff to undo his belt. Additionally, Defendants argue that Plaintiff's allegations cannot amount to a strip search because Plaintiff never stated that King touched Plaintiff's bare skin.

Defendants appear to argue that for a search to constitute a strip search an officer must touch under the plaintiff's clothes and examine the plaintiff's exposed body. As support, Defendants cite Brent v. Ashley, 247 F.3d 1294 (11th Cir. 2001), where the court found a search to be an illegal strip search when the

---

[12] While some strip searches may be legal, Plaintiff articulates reasons why this alleged strip search was illegal. However, counsel for Defendant King did not argue in the briefs or at the hearing that, even if the pat down amounted to a strip search, it was not an illegal strip search. Counsel only argues that the pat down could not constitute a strip search. As such, the Court will not analyze whether *this* alleged strip search was illegal as King's counsel has not addressed that issue.

However, with regard to Defendant Kendrick, discussed *infra*, his counsel did argue that, if Defendant Kendrick's search of Plaintiff amounted to a strip search, it was legal. The Court will address that argument when it addresses Defendant Kendrick's search.

officers pulled down the plaintiff's clothes, touched her crotch-area, examined her sanitary napkin, and squeezed her abdomen. <u>Brent</u>, 249 F.3d at 1298-1301.

However, the Eleventh Circuit did not indicate that to constitute a strip search an officer must examine under a detainee's clothes or touch a detainee's bare skin. <u>See generally</u> <u>id.</u> In fact, it appears that the parties did not dispute that the search constituted a strip search. <u>Id.</u> Instead, the parties disputed whether the strip search was illegal. <u>Id.</u>

The Supreme Court has held that "strip search" is an imprecise term difficult to properly define. <u>See</u> <u>Florence v. Bd. of Chosen Freeholders of Cty. of Burlington</u>, 182 L.Ed.2d 566, 132 S. Ct. 1510, 1515 (2012). According to the court:

> [a strip search] may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position.

<u>Id.</u>

Instead of unequivocally defining "strip search," the Supreme Court dictated that the better question is whether "[t]he need for a particular search [is] balanced against the resulting invasion of personal rights." <u>Id.</u> at 1516 (citing <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979)). In other words, the way in which a search is conducted, whether it constitutes a strip search or a regular search, must be reasonable.

The Court has already found that conducting a limited *Terry* frisk of Plaintiff would have been reasonable under the Terry framework. However, because it is disputed whether King's actions caused Plaintiff's belt to come undone, the Court must determine if undoing Plaintiff's belt was unreasonable under the circumstances.[13]

The Court finds that, if King undid Plaintiff's belt, the search went beyond the scope considered in Terry. Specifically, Terry calls for a limited patting of the outer clothing to determine whether the suspect has weapons. Sibron v. New York, 392 U.S. 40, 65 (1968) ("The search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault."). Defendants have not shown that undoing Plaintiff's belt fits within that limited framework. In fact, Defendants' insistence that Plaintiff's pants were already loose undermines the idea that King would need to undo Plaintiff's belt to determine if he were hiding any weapons in the waist band. As such, the Court finds that the search, as alleged by Plaintiff, went beyond Terry and became a warrantless search. See

---

[13] Defendants argue that King did not undo Plaintiff's belt. However, the facts do not establish, unequivocally, that he did not. The video footage of Plaintiff before his encounter with King does not show that Plaintiff's pants were already unbelted or already falling below his waist. Instead, Plaintiff's long shirt covers both his belt and his waist such that the Court cannot determine the facts either way. See CD at 20:58, Dkt. No. [126]. After his encounter with King, however, the footage shows Plaintiff struggling to keep his pants up as he stands next to the curb. See CD at 21:23:13, Dkt. No. [126]. Whether Plaintiff is struggling because King undid his belt or because his pants were already too loose is a question for the jury.

<u>Minnesota v. Dickerson</u>, 508 U.S. 366, 373 (1993) ("If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry*.").

Searches conducted without a warrant "are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions." <u>Katz</u>, 389 U.S. at 357. Those exceptions are (1) plain view; (2) consent; (3) searches incident to lawful arrest; (4) hot pursuit or emergency situations; (5) exigent circumstances; and (6) automobile exception. <u>Texas v. Brown</u>, 460 U.S. 730, 735-36 (1983).

Defendants have failed to argue that, if King conducted a warrantless search, his search fit into one of the delineated exceptions. Instead, Defendants focus only on the argument that King did not undo Plaintiff's belt. As such, the Court finds that, taking the facts in a light most favorable to Plaintiff and assuming King undid Plaintiff's belt, King is not entitled to summary judgment based on his argument that he did not violate Plaintiff's Fourth Amendment right against unreasonable search and seizure.

The next question is whether that right was clearly established. "For a 'right' to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right.'" <u>Rodgers v. Horsley</u>, 39 F.3d 308, 310 (11th Cir. 1994) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 639-40 (1987)) (emphasis in original). "When considering whether the law applicable to certain facts is clearly

established, the facts of cases relied upon as precedent are important." <u>Id.</u> (quoting <u>Adams v. St. Lucie Cty. Sheriff's Dept.</u>, 962 F.2d 1575 (11th Cir. 1992))

"The facts need not be the same as the facts of the immediate case. But they do need to be materially similar." <u>Id.</u> "Put differently, '[i]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." <u>Id.</u> (quoting <u>Post v. City of Fort Lauderdale</u>, 7 F.3d 1552, 1557 (11th Cir. 1993)).

Here, the question for the Court is whether it was clearly established that undoing Plaintiff's belt violated clearly established rights. The Court finds that the scope of a *Terry* frisk is "a carefully limited search of the outer clothing." <u>Terry</u>, 392 U.S. at 30. The Supreme Court has repeated that officers must be careful not to go beyond this limited pat down. <u>See id.</u>; <u>Florida v. Royer</u>, 460 U.S. 491, 510 (1983) ("*Terry* simply held that under certain carefully defined circumstances a police officer is 'entitled . . . to conduct a carefully limited search of the outer clothing."); <u>Sibron</u>, 392 U.S. at 65 ("The search for weapons approved in Terry consisted solely of a limited patting of the outer clothing.").

By allegedly going beyond Plaintiff's outer clothing and undoing Plaintiff's belt such that his pants fell below his buttocks, King violated clearly established law. As such, Defendants' Motion for Summary Judgment regarding the initial search is **DENIED** as to Defendant King because factual issues remain.

b. Are the remaining Officers liable?

Plaintiff also contends that the other Officers are liable for Plaintiff's initial search. While it is clear that the other Officers did not physically participate, Plaintiff claims they are liable because they had a duty to intervene.

As support, Plaintiff cites United States v. Koon, 34 F.3d 1416 (9th Cir. 1994), and Velazquez v. City of Hialeah, 484 F.3d 1340 (11th Cir. 2007). In those cases, the Ninth and Eleventh Circuits discussed how an officer who fails to take reasonable steps to protect a victim from another officers *excessive force* may be held liable to the same extent as the officer "who strikes the blows." Koon, 34 F.3d at 1447 n.25. Accord Velazquez, 484 F.3d at 1341-42.

Plaintiff attempts to extrapolate this rule and apply it to *all* Fourth Amendment violations, not just excessive force claims. As support, Plaintiff cites Byrd v. Clark, 783 F.2d 1002 (11th Cir. 1986), abrogated on other grounds as recognized by Nolen v. Isbell, 207 F.3d 1253, 1255-56 (11th Cir. 2000). In that case, the Eleventh Circuit held that, "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." Clark, 783 F.2d at 1007. According to Plaintiff, the language in Clark indicates that a police officer has a duty to intervene when *any* constitutional violation occurs in their presence; the inclusion of "such as an unprovoked beating" was intended merely as an example and does not exclude other violations.

20

Plaintiff fails to show that failure to intervene outside the context of excessive force is a clearly established violation. As discussed above, "[i]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Horsley, 39 F.3d at 310. Here, Plaintiff has only cited cases involving excessive force. See Clark, 783 F.2d at 1007; Koon, 34 F.3d at 1416; Velazquez, 484 F.3d at 1340; Byrd v. Brishke, 466 F.2d 6 (7th Cir. 1972). Plaintiff has not provided the Court with any cases where the passive officers were held liable for other constitutional violations. As such, the Court finds that, to the extent Plaintiff sought to hold Defendants Slay, Stolarsky, Bates, Kendrick, and Mitchell liable for failure to intervene in the first alleged unlawful search, Plaintiff's claims are **DISMISSED**.

### 2. Plaintiff's Second Search

The Court must now determine whether Defendants violated Plaintiff's Fourth Amendment right when Defendant Kendrick searched Plaintiff a second time and whether that right was clearly established. As with the first search, Plaintiff also attempts to hold each of the Defendant-Officers liable for this alleged violation. However, as discussed above, it was not clearly established at the time of the second search that the passive officers had a duty to intervene. As such, Defendants' Motion for Summary Judgment regarding Plaintiff's second search is **GRANTED** as to Defendants King, Mitchell, Slay, Stolarski, and Bates.

As to Defendant Kendrick, the video footage clearly shows Kendrick performing a second search/pat down on Plaintiff nearly immediately after King's

21

initial search. However, the footage does not clearly show the extent of this search.

Plaintiff contends that Kendrick performed a strip search when he (1) put his hands in the front of Plaintiff's pants; (2) searched his crotch area; and (3) felt in between his buttocks. Dkt. No. [125-14] at 78. Kendrick, on the other hand, claims to have done a pat down of Plaintiff's outer clothing and around his waistline.

The Court finds that there is a question of fact as to how the search occurred. As discussed above, if the frisk went as far as Plaintiff alleges, then it was an unreasonable warrantless search. See Dickerson, 508 U.S. at 373 (finding that a frisk that goes beyond a limited pat down exceeds the scope of Terry); Katz, 389 U.S. at 357 (finding warrantless searches *per se* unreasonable).

However, Kendrick argues that, even if this search amounted to a strip search and went beyond a simple pat down, it was reasonable. As support, Plaintiff cites two cases where the Eleventh Circuit found that *post* arrest strip searches were legal when the officers had reasonable suspicion that the claimants were concealing contraband or weapons on their bodies. Skurstenis v. Jones, 236 F.3d 678, 680 (11th Cir. 2000) (discussing legality of strip search on arrested detainees) overruled, Powell v. Barrett, 541 F.3d 1298 (11th Cir. 2008); Justice v. Peachtree City, 961 F.2d 188, 191 (11th Cir. 1992) (discussing strip search of teenager who was lawfully detained at the police station).

However, Kendrick's starting premise fails because Plaintiff was not under arrest at the time of the alleged search. Nor does it appear from the footage that Kendrick was searching Plaintiff because he planned on arresting him. Instead, the footage shows Kendrick searching Plaintiff, Plaintiff sitting on the curb for an extended period of time, Kendrick coming back over to Plaintiff, and only arresting him when the marijuana was found on the ground next to Plaintiff.

As such, the Court finds that, taking the facts in a light most favorable to Plaintiff, Kendrick is not entitled to summary judgment based on his contention that he did not violate Plaintiff's Fourth Amendment right against unreasonable search.[14] Additionally, as has already been discussed, it is clearly established that a pat down that goes beyond the scope of Terry without a warrant or an exception to the warrant requirement violates the Fourth Amendment. Terry, 392 U.S. at 30; Royer, 460 U.S. at 510 ("*Terry* simply held that under certain carefully defined circumstances a police officer is 'entitled . . . to conduct a carefully limited search of the outer clothing."); Sibron, 392 U.S. at 65 ("The search for weapons approved in Terry consisted solely of a limited patting of the outer

---

[14] At the hearing, Kendrick's counsel argued that once Kendrick smelled marijuana on or near Plaintiff he was entitled to perform any kind of search necessary to locate the drugs; including one that fits Plaintiff's allegations that Kendrick searched his crotch area and between his buttocks. As support he cited Evans v. Stephens, 407 F.3d 1272 (11th Cir. 2005). However, like the cases discussed above, that case also involves a *post* arrest investigatory search rather than a pre-arrest search. Evans, 407 F.3d at 1276 ("[The defendant] concluded the facts authorized the arrest of [the plaintiff]."). As such, the Court finds unpersuasive counsel's position that a police officer may conduct any kind of search, including an invasive search where the officer touches the suspect in their genital area, when he merely smells marijuana on or near the suspect.

clothing."); Katz, 389 U.S. at 357 (finding warrantless searches *per se* unreasonable without a warrant exception). Kendrick's Motion for Summary Judgment regarding the second search is **DENIED**.

### 3. Detaining Plaintiff

Plaintiff contends that the Officers violated his Fourth Amendment right against unreasonable seizure when they continued to detain Plaintiff after the initial investigatory stop. "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry, 392 U.S. at 16. An officer may conduct a brief, investigatory stop "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Jackson v. Sauls, 206 F.3d 1156, 1166 (11th Cir. 2000) (quoting Illinois v. Wardlow, 528 U.S. 119, 120 (2000)). However, when an officer asserts qualified immunity, "the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion" to detain a citizen during an investigatory stop. Id. (citing Williamson v. Mills, 65 F.3d 155, 157 (11th Cir. 1995)).

The question for the Court is not whether Kendrick had arguable reasonable suspicion to conduct the initial stop; Plaintiff has already conceded that the initial stop was constitutional. The question, instead, is whether Defendants had arguable reasonable suspicion to continue to detain Plaintiff for the duration of the stop.

The Eleventh Circuit has held that the duration of an investigatory stop "must be limited to the time necessary to effectuate the purpose of the stop." United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (citing United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999)). "In assessing whether a detention is too long in duration to be justified as in investigative stop, [the Court should] examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) (quoting United States v. Sharpe, 470 U.S. 675, 686 (1985)). As with all Fourth Amendment inquiries, the "ultimate touchstone . . . is reasonableness." United States v. Walker, 799 F.3d 1361, 1363 (11th Cir. 2015) (quoting Brigham City v. Stuart, 547 U.S. 398 (2006)).

Here, Plaintiff argues that the investigatory detention became unreasonable once Harris and Rodriguez admitted that the marijuana belonged to them and once Defendant Kendrick and King failed to find any marijuana on Plaintiff. In other words, Plaintiff contends that once it became clear that the illegal substances belonged to Harris and Rodriguez, the officers should have let him leave.

Defendants, on the other hand, argue the fact that Harris and Rodriguez had marijuana created arguable reasonable suspicion to detain Plaintiff for the duration of the investigation. Looking at the totality of the circumstances, the Court agrees. Plaintiff was in the car with Harris and Rodriguez when marijuana was found. Rodriguez admitted to having marijuana in her purse. Then, a canine

unit alerted to more marijuana in the car. Eventually, more marijuana was found.
Harris admitted to owning the marijuana, but Defendants continued to have
arguable reasonable suspicion that Plaintiff might also have marijuana either on
himself or hidden in the car based on the fact that the two other occupants
admitted to possessing the illegal substance. As such, Defendants' Motions for
Summary Judgment regarding Plaintiff's investigatory detention is **GRANTED**
as to all Defendants.

### 4. Excessive Force

Next, Plaintiff gives two arguments as to why, in effectuating his arrest,
Kendrick violated Plaintiff's Fourth Amendment right against unreasonable
seizure. First, Plaintiff argues that by placing him in a chokehold and bringing
him to the ground, Kendrick used excessive force in violation of the Fourth
Amendment.

Defendant Kendrick first denies that he placed Plaintiff in a chokehold.
Instead, he claims that he placed Plaintiff in bear hug. However, the video footage
clearly shows Kendrick placing his right arm around Plaintiff's neck from behind
and using his body weight to take Plaintiff to the ground. As such, the Court finds
there is at least a question of fact as to whether Kendrick utilized a chokehold on
Plaintiff. However, Kendrick argues that, even if he performed a chokehold, it
was not unreasonable under Eleventh Circuit case law.

"Fourth Amendment jurisprudence has long recognized that the right to
make an arrest of investigatory stop necessarily carries with it the right to use

some degree of physical coercion or threat thereof to effect it." Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002) (quoting Graham v. Connor, 490 U.S. 386, 396 (2001)). The Eleventh Circuit has held that "the application of de minis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." Id. at 1200.

Plaintiff failed to address this argument in his brief. Instead, he focuses solely on his state law claim for assault and battery, ignoring the Eleventh Circuit's case law regarding excessive force and the Fourth Amendment. Additionally, at the hearing, Plaintiff's counsel failed to present any mitigating case law that would cause the Court to find in Plaintiff's favor. As such, the Court finds that Kendrick's first argument is unopposed. L.R. 7.1B, NDGa.

At the hearing, Plaintiff argued that even if the chokehold did not constitute excessive force, because Kendrick did not have probable cause to arrest Plaintiff, discussed *infra*, any degree of touching constituted excessive force. However, under Eleventh Circuit law, "a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." Jackson v. Sauls, 206 F.3d 1156, 1171 (11th Cir. 2000) (citing Williamson v. Mills, 65 F.3d 155, 158-59 (11th Cir. 1995) (holding that a claim for excessive force based on a false arrest is subsumed into a false arrest claim because damages for false arrest include damages for use of force to effect that arrest)).

As to the remaining Officers, the Court finds that, because there is no constitutional violation for excessive force, the other Officers cannot be held liable for failure to intervene. See Clark, 783 F.2d at 1007 (finding liability for failure to intervene "*when a constitutional violation*" occurs). As such, Defendants' Motions for Summary Judgment regarding excessive force in violation of the Fourth Amendment is **GRANTED** as to all Defendants.

### 5. False Arrest

Finally, Plaintiff claims that Kendrick and the other Officers violated his Fourth Amendment right against unreasonable seizure when they placed him under arrest without probable cause. "Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment." Durruthy v. Pastor, 351 F.3d 1080, 1088 (11th Cir. 2003) (citing Redd v. City of Enterprise, 140 F.3d 1378, 1382 (11th Cir. 1998)). However, under the qualified immunity standard, the officer need only have arguable probable cause. Poulakis v. Rogers, 341 F. App'x 523, 526 (11th Cir. 2009). Arguable probable cause may be found where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant [ ] could have believed that probable cause existed to arrest." Lee, 284 F.3d at 1195 (quoting Scarborough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001)).

As to Kendrick, Plaintiff argues that Kendrick planted evidence to manufacture probable cause. Kendrick denies having planted evidence but, at the

hearing, his counsel argued that even if he had planted evidence, he had probable cause to arrest Plaintiff through constructive possession.

Turning first to Plaintiff's allegations that Kendrick planted evidence, "falsifying facts to establish probable cause is patently unconstitutional."[15] Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004). Accord Riley v. City of Montgomery, 104 F.3d 1247, 1253 (11th Cir. 1997) ("It is well established in 1989 that fabricating incriminating evidence violated constitutional rights."). Importantly, qualified immunity does not offer protection for officers who plant evidence or make deliberate false statements in violation of the law to support probable cause. Kingsland, 382 F.3d at 1232 (citing Holmes v. Kucynda, 321 F.3d 1069 (11th Cir. 2003)).

Plaintiff claims that, when no other officers were around, Kendrick deliberately threw marijuana onto the pavement behind Plaintiff to create probable cause for arrest. Kendrick, on the other hand, claims that he did not plant the evidence. Instead he claims that Plaintiff was fidgeting and moving his arms and legs throughout the investigation such that he was likely attempting to discard the hidden marijuana.

The video footage, which is not particularly clear, fails to demonstrate one way or the other that Kendrick planted the evidence behind Plaintiff. It merely

---

[15] As discussed above, Kendrick was charged in connection with this case for violating his oath of office for "unlawfully arresting Alphonzo Eleby for possession of marijuana, knowing that Eleby did not possess said marijuana." Dkt. No. [137] ¶ 97. However, a DeKalb jury acquitted Kendrick. Id. ¶ 99.

shows Kendrick walk into frame with his hand up and move his hands to a downward position. See C.D. at 21:37, Dkt. No. [126]. Plaintiff claims it is at that moment that Kendrick throws the evidence onto the ground. The footage shows that, within seconds of allegedly throwing the evidence, Kendrick looks behind Plaintiff and behaves as though he has found the evidence for the first time. He picks it up, and then tosses it in front of Plaintiff so Plaintiff can see he has found it. Plaintiff then gestures to the other officers in a way that suggests he is denying that the marijuana is his. Plaintiff is then placed under arrest.

 As to whether Plaintiff was moving around or fidgeting such that he could have discarded hidden marijuana, the Court finds that the video evidence is inconclusive. Based on the footage which shows Kendrick potentially throwing something in the area where the marijuana was found, and the fact that Kendrick and King both performed an allegedly thorough search of Plaintiff prior to the marijuana being found, questions of fact remain as to whether Kendrick planted the evidence to create probable cause.

Although questions of fact remain as to the issue of whether Kendrick planted evidence, Kendrick also argues that the arrest was based on arguable probable cause because Kendrick constructively possessed marijuana. As support, Kendrick's counsel cites Davenport v. State, 706 S.E.2d 757 (Ga. Ct. App. 2011). In that case, the Georgia Court of Appeals found that it is illegal for a person to be in constructive possession of contraband. Davenport, 706 S.E.2d at 763. However, a finding of constructive possession must be "based on a

connection between the defendant and the object that is more than spatial proximity." Id. In support of his constructive possession argument, Kendrick cites to the marijuana found in Ms. Rodriguez's purse and Mr. Harris' backpack.

Other than Plaintiff being in the car with the marijuana, counsel for Kendrick has not presented any other evidence that would show Plaintiff was in constructive possession of the marijuana. If anything, the facts as known to Kendrick at the time of the arrest dispel any arguable probable cause that Plaintiff was in constructive possession of the marijuana. See Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir. 2003) (finding that the officer lacked arguable probable cause to arrest plaintiff for constructive possession when the available evidence supported a conclusion that she was merely a visitor).

Indeed, "[s]ome 'nexus' must exist between the accused and the contraband, as [an arestee's] 'mere presence in the area of the contraband or awareness of its location is not sufficient to establish possession.'" Id. at 1080 (quoting U.S. v. Maspero, 496, F.2d 1354, 1359 (5th Cir. 1974)). "Constructive possession exists only when a defendant is able to exert more than minimal control and dominion over the premises where the contraband is located and has actual knowledge of the contraband's existence. Id. (citing U.S. v. Rackley, 742 F.2d 1266, 1272 (11th Cir. 1984)).

First, the drugs belonging to Ms. Rodriguez were found in her purse on her person. Second, she admitted on the scene and prior to Plaintiff's arrest that the drugs in her purse were hers. Third, Mr. Harris admitted prior to Plaintiff's arrest

that the drugs found in the backpack in the truck were his. And fourth, the truck where the drugs were found belonged to Mr. Harris. See Mitchell v. State, 492 S.E.2d 204, 205 (Ga. 1997) (finding there is no presumption of possession when the suspect does not own or control the car). Finally, Kendrick did not arrest Plaintiff when the marijuana was found in the purse and backpack. Instead, Kendrick waited until marijuana was found behind Plaintiff. The Court finds that Kendrick has not provided sufficient evidence of constructive possession. Instead, his evidence is only as to spatial proximity, which is not enough under the standard. Holmes, 321 F.3d at 1080.

As to whether such an arrest based only on spatial proximity is a clearly established violation, the Court finds that it is. In Holmes, the Eleventh Circuit held that, within the Eleventh Circuit and within other Circuits, "it is not enough that the [suspect] simply visited or made temporary use of the premises." Holmes, 321 F.3d at 1080. Indeed, as discussed above, there must be some nexus "between the accused and the contraband, as a [suspect's] 'mere presence in the area of contraband or awareness of its location is not sufficient to establish possession.'" Id. As such, Kendrick's argument that he could arrest Plaintiff for constructive possession is not persuasive.

As to the remaining Officer-Defendants, Plaintiff does not accuse them of falsifying evidence. Instead, Plaintiff simply argues that they did not have probable cause to arrest him. However, the Court finds that the other officers are

entitled to qualified immunity because their actions did not amount to a constitutional violation.

As discussed above, an officer must have arguable probable cause to make a warrantless arrest. Poulakis, 341 F. App'x at 526. Defendants argue, and the Court agrees, that the remaining Officer-Defendants had arguable probable cause to arrest Plaintiff after Kendrick told them about the allegedly discarded marijuana. There is no evidence that the other officers believed Kendrick falsified the evidence. For that reason, Defendants' Motion for Summary Judgment regarding Plaintiff's arrest is **GRANTED** as to Officers Mitchell, Bates, Slay, King, and Stolarski, and **DENIED** as to Kendrick.

### ii. DeKalb County

The Court now turns to whether DeKalb County may be held liable for Plaintiff's alleged constitutional violations.[16] "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v. Dep't of Social Servs. of City of New York, 436 U.S. 658, 694 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

---

[16] It is unclear from the Complaint whether Plaintiff intends to hold the individual Defendants liable in their official capacities. However, Defendants argue that, because suits against municipal officers in their official capacities and direct suits against the municipality are "functionally equivalent," the Court should grant summary judgment on all municipal liability claims against the individual officers in their *official* capacities. Busby v. City of Orlando, 931 F.2d 764 776 (11th Cir. 1991). Plaintiff does not contest this argument. As such, the Court **GRANTS** summary judgment for any municipal liability claims against the individual Defendants in their official capacities.

official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id.

Plaintiff asserts DeKalb County utilized two policies or customs that caused Plaintiff's alleged injuries.[17] First, Plaintiff claims that DeKalb County utilized an arrest quota system that led to Plaintiff's alleged false arrest. Specifically, Plaintiff contends that Kendrick's desire to fill his quota led to him framing Plaintiff for marijuana possession.

Plaintiff contends that, from March 13, 2002, through September 15, 2013, there was an unwritten custom that officers needed to make one to two custodial arrests per shift.[18] Dkt. No. [134-2] ¶¶ 5-10; Dkt. No. [90-2] ¶ 10.[19] According to

---

[17] Defendants argue that Plaintiff has asserted an additional policy and/or custom. Specifically, Defendants contend that Plaintiff has asserted a policy of unconstitutionally stopping and seizing citizens in violation of their Fourth Amendment rights. However, Plaintiff does not discuss this alleged policy in his brief as a separate policy. Instead, according to Plaintiff's argument, it appears that this alleged policy is actually subsumed in another policy. As such, the Court will not analyze it separately.

[18] At the hearing, Defendants objected to this alleged time line, asserting that the Affiants did not give any reason for why the quota system began and ended on those dates. However, it is clear that the dates provided by the Affiants reflect their tenure working for the DeKalb County Police Department. Because they worked at the Department during those dates, the information they provide in the declarations reflects their personal knowledge of the alleged policy.

Additionally, during the hearing, Defendants objected to the Affiants' declarations because they do not specifically say that the alleged quota system was in place on the exact day of Plaintiff's arrest. However, Affiant Davy specifically says that the quota system was in place and being enforced on July 6, 2012, the date of Plaintiff's arrest. Dkt. No. [134-2] ¶ 29. As such, the Court finds no reason why the Affiants' declarations should be thrown out for lack of specificity.

Plaintiff's proffered evidence, multiple affidavits from former DeKalb County police officers, the quotas could be averaged over time such that an officer need not make an arrest every shift if he or she made multiple during another shift. Dkt. No. [134-2] ¶ 8; Dkt. No. [90-2] ¶ 10. Additionally, the affiants state that, if an officer's quota was not met, he or she might lose a good assignment, be moved off a particular watch or precinct assignment, lose part-time jobs, not be allowed vacation days, or not be allowed to train for a promotion. Dkt. No. [134-2] ¶ 10; Dkt. No. [90-2] ¶ 11. The affiants state that, officers who met their quotas were praised, encouraged, and given better assignments over those who did not meet their quota. Dkt. No. [134-2] ¶ 10; Dkt. No. [90-2] ¶ 12.

According to Plaintiff, this quota system was taught to officers and routinely carried out by officers. Plaintiff's Affiants contend that their colleagues were encouraged by supervisors to write numerous, unnecessary tickets and focus on small marijuana busts to meet their numbers. Dkt. No. [90-2] ¶ 14.

---

[19] Defendants argue that the Court should not rely on Affiant Davy's declaration because, according to Defendants, most of his allegations occurred in 2008 or earlier; before Plaintiff's arrest. However, Defendants do not point to which of Davy's statements focus on 2008 or earlier. In fact, the affidavit says that Davy was hired from June 28, 1998, through January 1, 2008 and again from November 14, 2011 through April 15, 2013. Dkt. No. [134-2] ¶¶ 2, 27, 37. Davy then mentions that in 2000 or 2001, a strong push for the quota system began. Id. ¶ 12. However, he specifically states that the quota system was definitely in place and being enforced on July 6, 2012, the date of Plaintiff's arrest. Id. ¶ 29. As such, taking the facts in a light most favorable to Plaintiff, the Court presumes that his knowledge of the alleged quota system spanned the entirety of his employment, which includes the date of Plaintiff's arrest.

According to them, the result was that some officers acted "improperly" to achieve the required numbers. Id. ¶ 18.

Plaintiff claims that the evidence reflects a persistent custom attributable to DeKalb County. According to Plaintiff, DeKalb County officials knew about the quota system and therefore acquiesced. See Griffin v. City of Opa-Locka, 261 F.3d 1295, 1308 (11th Cir. 2001) (ongoing sexual harassment ignored and tolerated by city officials created municipal liability).[20]

Defendants first dispute that DeKalb County had a quota system. As support, Defendants cite deposition testimony of the Interim Police Chief saying that no such policy existed. Defendants rely on the Police Chief's statement that the former police officers describing the quota system were inaccurate. According to Defendant, without those affiants, the record is devoid of any evidence demonstrating a custom.

Additionally, Defendants argue that Plaintiff's Affiants fail to describe the policy with sufficient specificity. According to Defendants, they do not describe

---

[20] Defendants object to the use of Griffin because, according to Defendants, in that case the evidence established without any question that sexual harassment was an ongoing, accepted practice. Defendants stop their argument there, but presumably, Defendants believe this case is different because the record evidence does not demonstrate without any question that the quota system was an ongoing, accepted practice. However, Defendants' argument presumes that a municipal liability claim against a municipality must be dismissed on summary judgment if there is any question of fact as to whether the policy was accepted and ongoing. This is antithetical to the summary judgment standard which takes all facts in a light most favorable to Plaintiff as the nonmoving party. As such, the Court will consider Griffin in its analysis for the notion that a municipality may be held liable for acquiescing to an unconstitutional custom or policy.

specific situations or provide names of supervisors who encouraged the quota systems. Lastly, Defendants argue that the affiants admitted that they never witnessed a supervisor *requiring* officers to meet a quota.

The Court disagrees that the Affiants' testimony is overly vague or general. The Affiants outline the specific custom, describe specific consequences for failing to follow the custom, and discuss how the custom was enforced. Plaintiff's allegations, supported by these affidavits, demonstrate that this quota system and its consequences strongly encouraged compliance whether or not it was an open requirement.

And while the Interim Police Chief might dispute Plaintiff's Affiants, that does not require the Court to dismiss Plaintiff's claims. Instead, the Court finds there is a question of fact for the jury to determine whether the quota system existed.

Next, Defendants' counsel argued at the hearing that Plaintiff has failed to show that people who exercised control over DeKalb County's policies knew about the alleged quota system. That is to say, Defendants argue that even if there were a quota system in place, it cannot be attributed to DeKalb County because Plaintiff has not shown that those in charge of making decisions for the DeKalb County Police Department knew about it.

However, the Court disagrees that Plaintiff has not created at least a question of fact as to whether those in charge knew about the quota system. All the affidavits allege that if officers did not meet their quotas, they would suffer

some type of adverse action such as being taken off certain shifts, denied training, loss of part-time jobs, and denial of time off. <u>See, e.g.</u>, Dkt. No. [134-4] ¶ 12. The Affiants discuss how, after so-called "COMSTAT" meetings held at police headquarters with command staff, there would be an increase push by majors and captains to meet quotas. Dkt. No. [134-2] ¶ 21. And lastly, Affiants discuss captains directly discussing the quotas and discussing ways to meet them. <u>Id.</u> ¶ 23.[21]

This is at least circumstantial evidence that people at the top knew about, acquiesced to, or outright enforced the alleged policy. This is especially true given the fact the Affiants allege that (1) so-called "stat sheets" reflecting an officer's average number of arrests were sent up the chain of command; (2) those stat sheets specifically said that the officers had a quota to complete each day; (3) the quotas "were closely monitored by supervisors, all the way to the chiefs' offices;" and (4) the supervisors and command staff decided when to take adverse action based on the quota system. <u>Id.</u> ¶¶ 8-12. Additionally, the fact that so many police officers from different DeKalb County units attest to this alleged quota system shows that, if true, it is exceedingly wide spread and not limited to a handful of units. The Court finds there is enough evidence to establish a jury issue as to this policy and whether it extended high enough to establish policy.

---

[21] At the hearing, Defendants' counsel objected to evidence of another officer discussing the alleged system as hearsay. However, Plaintiff does not use these statements for the truth of the matter asserted. <u>See</u> FED. R. EVID. 801(c). Instead, they are used to show knowledge of an alleged system.

After showing there is a potential policy in place, Plaintiff must show that the policy caused his injuries. Importantly, in their initial Motion, Defendants fail to argue that there was no causal connection. However, in their reply brief, Defendants make a passing mention that, under <u>Monell</u>, Plaintiff must show a causal connection which he has failed to do.[22] Nonetheless, the Court finds that Plaintiff has presented sufficient evidence to create a question of fact as to whether Kendrick planted the evidence on Plaintiff so he could arrest him to abide by the County's alleged quota system.

Next, Plaintiff argues that DeKalb County is liable for his alleged injuries because it failed to train its officers. Inadequacy of police training may serve as a basis for a § 1983 claim only when the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 390-91 (1989). To establish deliberate indifference, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350 (11th Cir. 1998). However, without notice of a need to train or supervise, "a municipality is not liable as a matter of law for any failure to train and supervise." <u>Id.</u> at 1351.

---

[22] The Court notes that it need not consider arguments raised for the first time in a reply brief. <u>Lovett v. Ray</u>, 327 F.3d 1181, 1183 (11th Cir. 2003) ("[W]e do not consider arguments raised for the first time in a reply brief.").

According to Defendants, Plaintiff has failed to provide any evidence that DeKalb County knew of a need to train its officers and failed to do so. Plaintiff counters that training its officers in the quota system constitutes failure to train. However, the Court disagrees. While the alleged quota system may have caused Plaintiff's injuries, Plaintiff has failed to produce any evidence to show that it caused other citizens' injuries such that DeKalb County should have taken action in terms of training. See id. (requiring the municipality to know about the need to train). While one of Plaintiff's Affiants said the quota system caused other officers to act improperly, there is nothing to indicate that any other citizens were violated or that DeKalb County knew it was causing constitutional violations. However, because Plaintiff has shown one theory of municipal liability, Defendants' Motion for Summary Judgment is **DENIED** as to DeKalb County.

### B. State Law Claims

Plaintiff has brought seven state law claims against Defendants. At the hearing, Plaintiff clarified which claims he is bringing against which officers. They are (1) false imprisonment under Georgia law against Kendrick; (2) false arrest under Georgia law against Kendrick; (3) assault under Georgia law against Kendrick; (4) battery under Georgia law against Kendrick and King; (5) malicious prosecution under Georgia law against Kendrick and Mitchell; (6) bad faith fees and expenses under Georgia law against King, Kendrick and Mitchell; and (7)

punitive damages against Kendrick, King, and Mitchell. Defendants argue that the individual Defendants are immune from liability through official immunity.[23]

Under Georgia law, claims against a public officer acting in his official capacity are barred by the doctrine of official immunity unless the officer "(1) negligently performed a *ministerial* duty, or (2) acted with actual malice or an actual intent to cause injury while performing a *discretionary* duty." Lincoln Cty. v. Edmond, 501 S.E.2d 38, 41 (Ga. Ct. App. 1998) (emphasis in original). It is undisputed that the choices made by King and Kendrick were part of their discretionary duty. However, as to Mitchell, Plaintiff's counsel argued at the hearing that his offense constituted a ministerial duty, requiring only a showing of negligence. The Court will discuss the claims against King and Kendrick first.

In the context of official immunity, "actual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact." Marshall v. Browning, 712 S.E.2d 71, 74 (Ga. Ct. App. 2011). Importantly, "[a]ctual malice does not include implied malice, or the reckless disregard for the rights and safety of others." Id. (citation omitted).

Defendants contend that Plaintiff has failed to proffer any evidence of actual malice. However, as to Defendant Kendrick, the Court finds that Plaintiff has proffered sufficient evidence of actual malice. If Kendrick did plant evidence

---

[23] Defendants also argued that DeKalb County is immune through sovereign immunity. However, as Plaintiff argued, sovereign immunity is not implicated in this case because Plaintiff has not brought any state law claims against the County. As such, only municipal liability for the § 1983 claims is relevant and the Court will not analyze the County's sovereign immunity.

on Plaintiff so as to have probable cause to make an arrest, this shows a "deliberate intention to do wrong." <u>Marshall</u>, 712 S.E.2d at 74. Because there is a question of fact as to whether Kendrick planted the evidence, Defendants' Motions for Summary Judgment regarding false arrest, false imprisonment, and malicious prosecution are **DENIED**.

However, as to Plaintiff's claims for assault and battery based on the alleged strip search, Plaintiff has not provided any evidence that Kendrick acted with actual malice. While the search may have been unreasonable, there has not been any indication that Kendrick went beyond a *Terry* frisk with the express purpose to "do wrong." <u>See id.</u> As such, Kendrick's Motion for Summary Judgment as to assault and battery is **GRANTED**.

Similarly, the Court finds there is no evidence on the record to show that Defendant King's alleged search of Plaintiff rises to the level of actual malice. Allegedly undoing Plaintiff's belt does not demonstrate a deliberate intention to do wrong. The Court is unwilling to find that, without more, King acted with actual malice. As such, Defendants' Motion for Summary Judgment as to the state law claims against Defendant King is **GRANTED**.

As to Defendant Mitchell, Plaintiff alleges that he watched the video footage of Plaintiff's arrest, wrote a report finding that Kendrick did not plant evidence, and submitted the report without his supervisor's required consent. According to Plaintiff, Mitchell's actions prolonged his erroneous prosecution.

However, regardless of whether Mitchell's actions constitute a discretionary or ministerial action, the Court finds that Plaintiff has not shown how Mitchell's actions led to his malicious prosecution. In his responses to Defendants' Motions for Summary Judgment, Plaintiff fails to explain how Mitchell's report, made for an internal affairs investigation against Kendrick, prolonged Plaintiff's prosecution. The Court has reviewed the record and cannot find any evidence that Mitchell's actions led to any of Plaintiff's claimed injuries. As such, Defendants' Motion for Summary Judgment as to Mitchell is **GRANTED**.

## IV.   CONCLUSION

In accordance with the foregoing, the Court **DENIES IN PART** Defendants' Motions for Summary Judgment and **GRANTS IN PART** Defendants' Motions for Summary Judgment. [125, 128]. Specifically, the Court **DENIES** Defendants' Motions as to (1) Defendant King for Plaintiff's Fourth Amendment claim pertaining to the initial search; (2) Defendant Kendrick for Plaintiff's Fourth Amendment claim pertaining to the second search and his alleged false arrest; (3) DeKalb County for municipal liability; and (4) false imprisonment, false arrest, and malicious prosecution state law claims against Defendant Kendrick. The Court **GRANTS** Defendants' Motions as to (1) all the remaining Fourth Amendment claims and theories of liability against all Defendants; (2) the Fourteenth Amendment claim against all Defendants; and (3) the state law claims against the remaining Defendants.

The parties are **DIRECTED** to file a proposed consolidated pretrial order on or before October 11, 2016.

**IT IS SO ORDERED** this 8th day of September, 2016

LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE